PUBLIC COPY - CLASSIFIED INFORMATION DELETED

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 24, 2012          Decided August 3, 2012

No. 11-5123

OBAYDULLAH, DETAINEE, GUANTANAMO BAY AND SAMI AL
HAJJ, AS NEXT FRIEND OF OBAYDULLAH,
APPELLANTS

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES AND
LEON E. PANETTA, SECRETARY OF DEFENSE OF THE UNITED
STATES OF AMERICA,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01173)

*Lisa R. Jaskol* argued the cause for appellant Obaydullah.
With her on the briefs were *Ranjana Natarajan, Anne
Richardson, Dan Stormer, Cindy Panuco, Jon B. Eisenberg,* and
*Pardiss Kebriaei.*

*Benjamin M. Shultz,* Attorney, U.S. Department of Justice,
argued the cause for appellees. With him on the brief were *Tony
West,* Assistant Attorney General, and *Robert M. Loeb,*
Attorney.

PUBLIC COPY - CLASSIFIED INFORMATION DELETED

Before: SENTELLE, *Chief Judge*, and HENDERSON and GARLAND, *Circuit Judges*.

Opinion for the court filed PER CURIAM.

Dissenting opinion filed by *Chief Judge* SENTELLE.

PER CURIAM:* Obaydullah, a detainee at the United States Naval Station at Guantanamo Bay, Cuba, appeals from the district court's denial of his petition for a writ of habeas corpus.[1] For the reasons set forth below, we affirm the judgment of the district court.

## I

Obaydullah is an Afghan citizen who is approximately 29 years old. He grew up in the village of Milani in Afghanistan's Khost province, where he was living at the time of his capture. On July 21, 2002, U.S. military forces conducted a raid at Obaydullah's home based on certain intelligence reports. *Obaydullah v. Obama*, 774 F. Supp. 2d 34, 35 (D.D.C. 2011).[2]

---

*NOTE: Portions of this opinion contain classified information, which has been redacted.

[1] The detainee has only one name, Obaydullah, which is sometimes spelled "Obaidullah."

[2] According to the government's intelligence,

PUBLIC COPY - CLASSIFIED INFORMATION DELETED

During the raid of the compound in which Obaydullah was living, U.S. forces discovered a notebook in Obaydullah's pocket that contained diagrams of explosives, and also found 23 anti-tank mines buried nearby outside. *Id.* at 36; *see* Dep't of Def. Criminal Investigation Task Force Report (CITF Report) (J.A. 713). According to a staff sergeant who was present during the raid and submitted a sworn declaration, Obaydullah initially said that the diagrams were of wiring for a generator and that he was keeping the mines for someone named "Karim." Staff Sergeant Decl. ¶ 5 (J.A. 2495); *see* CITF Report (J.A. 713). The team also found a tarp-covered car on the property that contained Taliban propaganda and had dried blood on the back seat. CITF Report (J.A. 713); Staff Sergeant Decl. ¶ 5 (J.A. 2495).[3] Obaydullah was taken into custody and eventually transferred to the U.S. Naval Station at Guantanamo Bay.[4]



[3] Additionally, U.S. forces found ▮▮▮▮▮ ▮▮▮▮▮ Staff Sergeant Decl. ¶ 7 (J.A. 2495).

[4] ▮▮▮▮▮

4

On July 7, 2008, Obaydullah filed a petition for a writ of habeas corpus. In November 2008, however, the government filed charges against Obaydullah for the purpose of initiating a prosecution before a military commission. As a result, the parties agreed to stay the habeas proceedings. Then, following President Obama's suspension of military commissions proceedings in January 2009, Obaydullah moved to vacate the stay. The district court denied his motion, but this court reversed. *See Obaydullah v. Obama*, 609 F.3d 444 (D.C. Cir. 2010).[5] Thereafter, habeas proceedings resumed before the district court. On November 30, 2010, the court entered judgment denying Obaydullah's habeas petition, concluding that the government had established "that it is more likely than not that [Obaydullah] was in fact a member of an al Qaeda bomb cell, and is therefore detainable." *Obaydullah*, 774 F. Supp. 2d at 36. Obaydullah filed a motion for reconsideration, which was also denied. He then filed his notice of appeal.

Obaydullah contends that he was captured in "a case of mistaken identity," Obaydullah Br. 1, and he presents alternative explanations for the notebook and the mines. In that connection, he argues that the district court erred in relying on government



[5] Although military commission proceedings have since resumed against certain other Guantanamo detainees, the government has not indicated that it intends to try Obaydullah before such a commission.

intelligence reports that linked him to al Qaeda and gave rise to the raid during which he was captured. Obaydullah also contends that the court erred in denying his requests for discovery. We examine Obaydullah's merits contentions in Part III and his discovery contentions in Part IV. We begin, however, with a question about our jurisdiction.

## II

The district court denied Obaydullah's habeas petition on November 30, 2010. Twenty-two days later, Obaydullah requested a two-day extension to file a motion for reconsideration pursuant to Federal Rule of Civil Procedure 59(e). Rule 59(e) provides that such motions must be filed within 28 days after entry of a final judgment, and Rule 6(b)(2) further states that this deadline cannot be extended. FED. R. CIV. P. 59(e); *id.* 6(b)(2). Nonetheless, the government did not oppose the request, and the court granted it. Obaydullah filed his Rule 59(e) motion on December 30, 2010 (that is, 30 days after the judgment), and the court ultimately denied that motion on March 24, 2011. On May 17, 2011, Obaydullah filed his notice of appeal.

28 U.S.C. § 2107(b) states that an appellate court has jurisdiction of a case only if a notice of appeal is filed within 60 days of the entry of a judgment (where the government is a party to the case). But under Federal Rule of Appellate Procedure 4(a)(4)(A), "[i]f a party timely files" certain subsequent motions in the district court, "the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion." FED. R. APP. P. (FRAP) 4(a)(4)(A). A Rule 59 motion falls within this category, FRAP 4(a)(4)(A)(iv), and

PUBLIC COPY - CLASSIFIED INFORMATION DELETED

Obaydullah filed his notice of appeal within 60 days after the district court denied his Rule 59(e) motion.[6] The potential problem is that, arguably, Obaydullah's Rule 59(e) filing was not "timely" within the meaning of FRAP 4(a)(4)(A) because it came more than 28 days after entry of the court's judgment. If his Rule 59(e) motion was not timely, then it failed to trigger FRAP 4(a)(4)(A)'s tolling provision. And without tolling, Obaydullah's appeal would be too late (having been filed more than 60 days after the district court entered judgment on the denial of the habeas petition), and we would thus lack jurisdiction to hear his case.

There is no doubt that, if Obaydullah had simply exceeded the deadline prescribed in 28 U.S.C. § 2107(b), we would have no jurisdiction. *See Bowles v. Russell*, 551 U.S. 205, 206 (2007). The question is whether his Rule 59(e) motion triggered FRAP 4(a)(4)(A)'s tolling provision, notwithstanding that it may not have been "timely" under the latter rule. Obaydullah contends that FRAP 4(a)(4)(A)'s timeliness requirement is a "claim-processing rule" subject to waiver. The government agrees that it can be construed as such and, "to the extent it can, [it] waives any objection to the fact that [Obaydullah's] reconsideration motion was not timely filed." U.S. Br. 3. But if FRAP 4(a)(4)(A)'s timeliness provision is in fact a jurisdictional rather than a claim-processing rule, then it pertains directly to our "'power to hear [the] case'" and "'can never be forfeited or waived.'" *Union Pac. R.R. Co. v. Bhd. of*

---

[6]For that reason, we unquestionably would have appellate jurisdiction over a challenge to the court's denial of Obaydullah's 59(e) motion, but Obaydullah has not raised the issues addressed in that motion in these proceedings.

*Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment*, 130 S. Ct. 584, 596 (2009) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)). "In contrast, a 'claim-processing rule, . . . even if unalterable on a party's application,' does not reduce the adjudicatory domain of a tribunal" and may be forfeited. *Id.* (quoting *Kontrick v. Ryan*, 540 U.S. 443, 456 (2004)). Because we "have an independent obligation to ensure that [we] do not exceed the scope of [our] jurisdiction," we must "decide jurisdictional questions" even when the parties "elect not to press" them. *Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1202 (2011).

As a general matter, "only timing rules that have a statutory basis are jurisdictional." *Youkelsone v. FDIC*, 660 F.3d 473, 475 (D.C. Cir. 2011). The Supreme Court made this dividing line explicit when, in *Bowles*, it found that a provision of FRAP 4(a)(6) allowing a district court to reopen a party's time for filing a notice of appeal "for a period of 14 days" is an absolute jurisdictional requirement because it is expressly codified in 28 U.S.C. § 2107(c). *See Bowles*, 551 U.S. at 213 ("Because Congress specifically limited the amount of time by which district courts can extend the notice-of-appeal period in § 2107(c), that limitation is [jurisdictional]."). Here, the *general* 60-day deadline for filing an appeal has an obvious statutory basis (in § 2107(b)), but the provisions in FRAP 4(a)(4)(A) allowing for modification or tolling of that deadline do not have such a basis.

Because FRAP 4(a) implements § 2107, there is at least a theoretical argument that it, too, must be jurisdictional. But two cases from this circuit have specifically examined provisions of FRAP 4(a) and have concluded that, because those provisions

PUBLIC COPY - CLASSIFIED INFORMATION DELETED

themselves lack statutory analogues, they are claim-processing rules subject to waiver or forfeiture. Those cases directly control our analysis.

First, in *Wilburn v. Robinson*, 480 F.3d 1140 (D.C. Cir. 2007), we found that FRAP (4)(a)(4)(A)(*vi*), which tolls the deadline when a party files a *Rule 60* motion, is a claim-processing rule. That provision tolled the deadline where such a motion was filed within ten days after judgment (the period is now 28 days), and the appellant had filed his motion one day late. Because the other party had failed to object, the court was required to decide whether the rule was jurisdictional. We held that it was not. Rather, we concluded that "[t]he tolling language of Rule 4(a)(4)(A)(vi) fits the [Supreme] Court's description of a claim-processing rule" by "establish[ing] a deadline . . . within which a party must file [the motion] in order to toll the time limit for filing a notice of appeal" and by affording an affirmative defense to untimely appeals. *Id.* at 1145 (citing *Eberhart v. United States*, 546 U.S. 12, 15 (2005); *Kontrick*, 540 U.S. at 456). Because that particular deadline possessed both these characteristics, and was *not* codified by statute, *see id.* at 1145 n.9, we held that it was subject to forfeiture. *Id.* at 1146. Thus, the appellant's *untimely* Rule 60(b) motion was sufficient to toll the appeals deadline.

*Wilburn* alone should be conclusive here: there is no real difference between permitting a late Rule 59(e) motion to trigger FRAP 4(a)'s tolling provision under FRAP 4(a)(4)(A)(iv) and permitting a late Rule 60 motion to do so under FRAP

4(a)(4)(A)(vi).[7] And while *Wilburn* was decided just before the Supreme Court's decision in *Bowles*, the *Wilburn* opinion noted the Sixth Circuit's ruling in that case (which the Supreme Court later upheld) and distinguished its rationale: the 14-day window at issue in *Bowles* is codified in § 2107(c), the court noted, while "the tolling language of Rule 4(a)(4)(A)(vi) has not been made jurisdictional by statute." *Wilburn*, 480 F.3d at 1145 n.9.

Lest there be any remaining doubt regarding this circuit's law, however, our holding in *Youkelsone* reiterates that key provisions within FRAP 4(a) that are not codified by statute are claim-processing rules. *Youkelsone* dealt with FRAP 4(a)(5)(c), which allows a district court to extend the time to file a notice of appeal but caps such extensions at "30 days after the prescribed time." The district court had extended the deadline one more day than it should have, and the appellant filed her notice of appeal on that day. The other party had failed to object, however, and we found that FRAP 4(a)(5)(C)'s deadline did not operate as a jurisdictional bar. Importantly, we noted that "[a]lthough the authority to extend the time available to file an appeal is codified at 28 U.S.C. § 2107[(c)], Rule 4(a)(5)(C)'s

---

[7]The only possible distinction is that FRAP 4(a)(4)(A)(iv) does not have a specific deadline; tolling begins simply when a "timely" Rule 59 motion has been filed. But the reason for the absence of a deadline in the FRAP is obvious: Rule 59 itself prescribes its deadline (28 days), whereas Rule 60 motions can in some circumstances be filed months or years after judgment – hence the need for a limitation in the FRAP. This difference is immaterial: if Rule 4(a)(4)(A)(iv) precisely paralleled (vi) by specifying that a Rule 59 motion "filed within 28 days" would toll the appeals deadline, that 28-day limit would be subject to waiver for the same reason the 10-day (now 28-day) limit in Rule 4(a)(4)(A)(vi) was held subject to waiver.

PUBLIC COPY - CLASSIFIED INFORMATION DELETED

thirty-day limit on the length of any extension ultimately granted appears nowhere in the U.S. Code." *Youkelsone*, 660 F.3d at 475. We immediately followed this observation with the conclusion that 4(a)(5)(c) "is thus a claim-processing rule" – followed by a citation to *Wilburn*. *Id.*[8]

Our decision in *In re Sealed Case*, 624 F.3d 482 (D.C. Cir. 2010), is not to the contrary. First, like *Bowles*, it involved the specific "reopening" provision set forth in 28 U.S.C. § 2107(c). As relevant here, that provision – which is substantively identical to FRAP 4(a)(6)(B) – allows a district court to reopen the window for filing an appeal where certain conditions are met and where the motion is "filed within 180 days" after entry of the judgment. 28 U.S.C. § 2107(c); *see* FRAP 4(a)(6)(B). The appellant in *Sealed Case* failed to file by that deadline. After his motion to reopen was therefore rejected by the district court on timeliness grounds, the appellant filed a Rule 60(b) motion for relief from judgment. But he wasn't really asking for relief from judgment; rather, he wanted the district court to vacate *and then reinstate* the judgment in one fell swoop so that he could then file an appeal. *Id.* at 486. The district court declined to do so, and we agreed that "Congress' codification of [FRAP] 4(a)(6)'s reopening provisions [in 28 U.S.C. § 2107(c)] [is] a jurisdictional limitation" that cannot be relaxed based on the equities of a case, nor "circumvent[ed]" by allowing a court to

---

[8]Although *Youkelsone* did not cite *Bowles* specifically, the decision plainly followed its precepts. *See Youkelsone*, 660 F.3d at 475 ("'Only Congress may determine a lower federal court's subject-matter jurisdiction.' Accordingly, only timing rules that have a statutory basis are jurisdictional." (quoting *Kontick*, 540 U.S. at 452)).

11

vacate and then reinstate a judgment so as to re-start the clock for filing an appeal. *Id.* at 486-87.

*Sealed Case* does not establish a general "anti-circumvention" principle applicable in all circumstances. Although it does indicate that we should not allow sham maneuvers undertaken to avoid hard jurisdictional deadlines, the very existence of FRAP 4(a)(4)'s tolling provision shows that the general statutory deadline for filing an appeal can in fact be extended through the court's own claim-processing rules. And *Wilburn* and *Youkelsone*, the two cases most directly on point, show that we can exercise appellate jurisdiction even when an appellant has failed to comply with the deadlines set in FRAP 4(a)(4) and 4(a)(5), respectively. As *Wilburn* explained in the course of rejecting an argument raised by the dissent in that case:

> The dissent . . . implies that the . . . time limit contained in Rule 59(e) and the similar limit in Rule 60(b) imported from FRAP 4(a)(4)(A)(vi) are jurisdictional by an attenuated line of reasoning: (1) because 28 U.S.C. § 2107(a) is jurisdictional, FRAP 4(a)(1)(A) must also be jurisdictional and (2) because FRAP 4(a)(1)(A) is jurisdictional, the timeliness provisions contained in FRAP 4(a)(4)(A) must also be jurisdictional – meaning that 28 U.S.C. § 2107(a) renders Rule 59(e)'s [then] ten-day period jurisdictional, at least for the purpose of appellate tolling. . . . *It is unlikely that the Supreme Court had such jurisdictional boot-strapping in mind* when it so plainly tightened its use of the term 'jurisdictional' in

12

relation to express time prescriptions included in the federal rules.

*Wilburn*, 480 F.3d at 1146 n.11 (emphasis added). The kind of "jurisdictional boot-strapping" the court rejected in *Wilburn* is precisely what we would effectuate were we to hold that Obaydullah's late Rule 59(e) motion bars the hearing of his appeal.

Finally, *Bowles*'s treatment of two earlier Supreme Court decisions discussed by our dissenting colleague does not undermine our circuit's precedents. *Bowles* cited the first, *Browder v. Director, Dep't of Corrections*, 434 U.S. 257 (1978), merely as part of a string cite for the proposition that "[t]his Court has long held that the taking of an appeal within the prescribed time is 'mandatory and jurisdictional.'" *Bowles*, 551 U.S. at 209-10. The Court followed that proposition with a footnote stating that its cases "have noted the jurisdictional significance of the fact that a time limit is set forth in a statute," and have "pointed to § 2107 as a statute deserving of jurisdictional treatment." *Id.* at 210. Similarly, *Bowles* cited the second decision, *Thompson v. INS*, 375 U.S. 384 (1964), merely to make clear that it was overruling the "unique circumstances" doctrine set forth in that case. *Id.* at 214. The Court overruled *Thompson* only "to the extent [it] purport[ed] to authorize an exception to a jurisdictional rule" based on that doctrine. *Id.* It did not suggest what the correct disposition would have been in *Thompson* in the absence of that exception, nor did it indicate which rules were jurisdictional in that case.

In sum, in light of this circuit's decisions in *Wilburn* and *Youkelsone*, and the government's waiver of any timeliness

13

objection, we conclude that we may proceed to a consideration of Obaydullah's appeal.

## III

Following al Qaeda's attacks against the United States on September 11, 2001, Congress passed the Authorization for Use of Military Force (AUMF), which provides:

> [T]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001) (codified at 50 U.S.C. § 1541 note). "As this court has now repeatedly held, the AUMF 'gives the United States government the authority to detain a person who is found to have been "part of" al Qaeda or Taliban forces,'" *Al Alwi v. Obama*, 653 F.3d 11, 16 (D.C. Cir. 2011) (quoting *Al Odah v. United States*, 611 F.3d 8, 10 (D.C. Cir. 2010)), and Congress has since affirmed that authority, *see* National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1021, 125 Stat. 1298, 1562 (2011) (codified at 10 U.S.C. § 801 note).

Based on the evidence before it, the district court concluded that the government "more than adequately established that it is more likely than not that [Obaydullah] was in fact a member of

**PUBLIC COPY - CLASSIFIED INFORMATION DELETED**

an al Qaeda bomb cell, and is therefore detainable under the AUMF." *Obaydullah*, 774 F. Supp. 2d at 36. This conclusion presents a mixed question of law and fact. *Alsabri v. Obama*, – F.3d –, –, 2012 WL 2895585, at *2 (D.C. Cir. 2012). "That is, whether a detainee's alleged conduct is sufficient to make him 'part of'" al Qaeda is a "legal question[] that we review de novo." *Khan v. Obama*, 655 F.3d 20, 26 (D.C. Cir. 2011). But "[w]e review the court's specific factual determinations about what happened . . . for clear error," *Alsabri*, 2012 WL 2895585, at *2 (citing *Khan*, 655 F.3d at 26), as well as "[t]he 'question whether evidence is sufficiently reliable to credit,'" *id.* (quoting *Al Alwi*, 653 F.3d at 19). We may find clear error "only if, 'on the entire evidence, we are left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Barhoumi v. Obama*, 609 F.3d 416, 423 (D.C. Cir. 2010)).

## A

The most direct evidence linking Obaydullah to al Qaeda comes from the intelligence reports that precipitated the raid[9]

---

[9]More specifically, when U.S. forces entered Obaydullah's residence, they were acting on a tip that

15

and from the raid itself. When U.S. forces entered Obaydullah's residence, they found a notebook containing diagrams of explosives in his pocket. They then found 23 anti-tank mines buried outside the compound nearby. Obaydullah does not dispute these two central facts, although he does contest some of the details. *See* Obaydullah Br. 51 (asserting that "the notebook does not . . . contain 'detailed' instructions on IED construction," but "only general information that would serve as refresher notes for an individual trained on the subject"); *id.* at 44-45 (raising discrepancy in number and location of mines, as compared to the pre-raid intelligence).

Notwithstanding the notebook and mines, Obaydullah contends that the government's pre-raid intelligence reports linking him to al Qaeda are not reliable and have not been sufficiently corroborated. We have explained that, although raw intelligence reports alone may not provide a sufficient basis for a court to assess whether the government has met its burden, we may rely upon such evidence if we are "'able to assess the reliability of [it] ourselves' by evaluating" factors such as "internal coherence" and "consistency with uncontested record evidence." *Barhoumi,* 609 F.3d at 428 (quoting *Parhat v. Gates,* 532 F.3d 834, 848 (D.C. Cir. 2008)). Here, the pre-raid intelligence linking Obaydullah to an al Qaeda bomb cell is plainly corroborated by what was found at the raid: a notebook with diagrams of explosives in Obaydullah's pocket and mines buried outside his house. And while Obaydullah claims that the

*see also supra* notes 2, 4.

16

raid failed to corroborate other aspects of the intelligence, his arguments rest on inconsistencies that the district court reasonably construed as minor within the bigger picture. For example, Obaydullah points to a discrepancy in the *number* of mines found as compared to that indicated in the pre-raid intelligence, *see Obaydullah*, 774 F. Supp. 2d at 38, and he notes that the mines were buried "25 to 30 meters *outside* the compound," Obaydullah Br. 45 (emphasis in original).[10]

As the district court put it, "[w]hat matters is that there were, in fact, 23 anti-tank mines . . . that were found in close

---

[10]There is also some dispute about discrepancies regarding names: ███████████████████████████ ████████████████████████████ But Obaydullah has acknowledged that he sometimes goes by the names "Baidullah" or "Baitullah." Obaydullah Decl. ¶ 33 (J.A. 1493). And ███

proximity to the petitioner's compound." *Obaydullah*, 774 F. Supp. 2d at 38. Perhaps even more to the point, the intelligence linking Obaydullah to an al Qaeda bomb cell is corroborated by the fact that he had a notebook with diagrams of explosives in his pocket. *Id.* While it is possible that the bombs and the notebook can be explained by other circumstances, *see infra* Section III.B – or that Obaydullah was some sort of "freelance" bomb-maker not linked to al Qaeda, *cf. Salahi v. Obama*, 625 F.3d 745, 752 (D.C. Cir. 2010) – the district court's conclusion that these circumstances sufficiently corroborated the pre-raid intelligence falls well within the realm of reasonableness.

Likewise, ██████████████████████████████ ██████████████████████████████ is corroborated by the fact that, according to the staff sergeant who was present during the raid, Obaydullah initially said he was keeping the mines for "Karim," CITF Report (J.A. 713). Obaydullah now suggests that his statements at the scene of the raid may have been coerced, or, alternatively, that he never said this at all. But he has shown no evidence of coercion at the scene of the raid, nor did he raise this argument in the district court below. He has stated, and the government acknowledges, that he was restrained by plastic cuffs and had a hood placed over his head during the raid. Obaydullah Decl. ¶ 2 (J.A. 1484); Staff Sergeant Decl. ¶ 6 (J.A. 2495). But those circumstances alone do not warrant rejection of any reliance on his statements, particularly because there was other affirmative evidence that Obaydullah was not coerced.[11]

---

[11] ███████████████████████████████████████
███████████████████████████████████████

**PUBLIC COPY - CLASSIFIED INFORMATION DELETED**

In the alternative, Obaydullah suggests that he never made the statements at all by challenging the district court's (and the government's) reliance on translations made at the scene of the raid. This argument has three problems. First, it is inconsistent with his suggestion that he was coerced into making the statements (notwithstanding the claim that it is presented "in the alternative"); and the district court was therefore justified in regarding the mistranslation claim as not credible. Second, Obaydullah does not challenge the interpretation of any particular words he spoke or proffer their true meaning. He makes only a blanket contention that the court should not have afforded credibility to a particular translator because the translator was later fired for making faulty translations. Obaydullah Br. 38 n.11. (He does challenge translations of particular statements by *other* translators during other interrogations, *id.*, but those statements are not at issue here.) We cannot conclude that the district court's decision to credit the translation was clear error when Obaydullah has made no allegation of a specific, material mistranslation. *Cf. Barhoumi*, 609 F.3d at 431 (rejecting the petitioner's "suggestion that the translator's forthrightness regarding uncertainties surrounding the date of particular diary entries somehow taints the reliability of the diary as a whole"). Third, in any event Obaydullah concedes that he did have a relationship with a man named

Karim Bostan, Obaydullah Traverse ¶ 28 (J.A. 1459) – another Guantanamo detainee who, according to the government, is the "Karim" implicated here.[12]

Finally, we note that Obaydullah's connections to al Qaeda are further corroborated by



---

[12]Obaydullah states that he and Karim Bostan were former business partners. Obaydullah Br. 5; Obaydullah Traverse ¶ 28 (J.A. 1459). He does not dispute that they also were both members of Jama'at Tablighi (JT), which is how they met. Traverse ¶ 28 (J.A. 1459). JT is "an Islamic missionary organization, which U.S. intelligence has designated a Terrorist Support Entity[,] a category of organizations that has 'demonstrated intent and willingness to provide financial support to terrorist organizations,' or to provide 'witting operational support' to terrorist groups," including al Qaeda. *Almerfedi v. Obama*, 654 F.3d 1, 2 (D.C. Cir. 2011); *see Obaydullah*, 774 F. Supp. 2d at 39. The district court cited evidence of Obaydullah's relationship with Bostan and their respective involvement in JT as one factor in support of finding that Obaydullah was part of al Qaeda. *Obaydullah*, 774 F. Supp. 2d at 39. This court has likewise found membership or association with JT to be probative of membership in al Qaeda. *Almerfedi*, 654 F.3d at 6.



B

Obaydullah has presented alternative explanations for both the notebook and the landmines. As to the first, he contends that the diagrams in the notebook – which he acknowledges depict explosives – are from a class at a mechanical school in Khost that the Taliban forced him to attend, and from which he "fled after two days." Obaydullah Br. 12-13, 52. "Not realizing the notes could be a threat to him," he says that he "later used the notebook to record information about a pots-and-pans store he operated." *Id.* at 52. But apart from his citation to a 2002 State Department document referencing reports of forcible conscriptions by the Taliban, *see* J.A. 2132, Obaydullah has provided no evidence corroborating this version of events or explaining his implausible decision to hold on to the notebook. Moreover, as noted above, the government produced evidence that, when initially confronted with the notebook at the scene of the raid, Obaydullah said the diagrams were depictions of wiring for a generator. CITF Report (J.A. 713); Staff Sergeant Decl.

¶ 5 (J.A. 2495).[13] Based on that inconsistency, we cannot find that the district court committed clear error in concluding that Obaydullah's explanation was not credible.

As to the mines, Obaydullah contends that they were left over from the conflict against the Soviets in the 1980s and were buried long ago by members of his family. Obaydullah Br. 11-12. He cites a good deal of evidence that landmines are buried throughout the country, and the government concedes that they are "abundant in Afghanistan, due to decades of conflict." ████ Decl. ¶ 12 (J.A. 606). We agree that landmines buried outside a house in Afghanistan are therefore not as obviously inculpatory as they would be if found, for example, in the backyard of a house in Washington, D.C. But, as noted above, the government produced evidence that, when initially asked about the mines at the scene of the raid, Obaydullah said nothing about their being left over from long ago; rather, he said he was keeping them for someone named Karim. CITF Report (J.A. 713). Again, we find that the district court's decision to credit the government regarding this account was not clear error: the court relied upon the statements of the staff sergeant who participated in the raid, *id.*, against Obaydullah's unsupported claim of coercion at the scene and his blanket challenge to the translator's reliability. In addition, the notebook found in Obaydullah's pocket, which concededly depicts diagrams of explosives, plainly supports a further connection between

---

[13]As with his statement about keeping the mines for Karim, Obaydullah disclaims this statement as likely resulting from coercion; alternatively, he denies that he made it at all. For the reasons described above, the district court did not clearly err in crediting the government's account.

PUBLIC COPY - CLASSIFIED INFORMATION DELETED

Obaydullah and the buried mines. Taking these circumstances together, the district court did not commit clear error when it declined to credit Obaydullah's explanation that the mines were left over from the conflict of the 1980s.

Finally, Obaydullah argues that the district court "fundamentally misconstrued the pre-raid intelligence on which Obaydullah's detention is primarily based, wrongly believing the intelligence placed Obaydullah at the scene of an accidental IED explosion, ferrying injured bomb cell members to the hospital." Reply Br. 1; *see* Obaydullah Br. 53-54. The district court cited an interview report of the staff sergeant who participated in the raid "indicating that the petitioner and Karim Bostan, in the aftermath of an accidental explosion, were seen driving an automobile taking several wounded bomb cell members to a local hospital for medical attention." *Obaydullah*, 774 F. Supp. 2d at 38 (citing CITF Report (J.A. 713)). The court cited the blood found in the backseat of the car as further corroboration of this account. *Id.* But while the court accurately characterized the staff sergeant's statement, *see* CITF Report (J.A. 713), we agree with Obaydullah that this statement mischaracterized the intelligence upon which it appears to have been based, a point the government does not dispute. That intelligence stated ███████████████████████████████████████████████████████████████████████████████████████ But even if this characterization constituted error, we do not agree that it "infected the entire proceeding" or was "foundational" to the

**PUBLIC COPY - CLASSIFIED INFORMATION DELETED**

district court's reasoning. Reply Br. 22, 1. The court discussed this evidence only after it had already assessed evidence from the pre-raid intelligence, the ███████████ the fruits of the raid, and Obaydullah's lack of credibility. And even if we eliminate evidence that Obaydullah and/or Bostan "were seen" driving injured bomb cell members to a hospital, the uncontested fact still remains that U.S. soldiers found substantial amounts of blood in the back seat of the car, CITF Report (J.A. 713); Staff Sergeant Decl. ¶ 7 (J.A. 2495).

IV

Obaydullah further contends that the district court improperly denied his requests for discovery on two separate matters, and that it committed a number of additional legal errors. Discovery requests in this case were made pursuant to a Case Management Order (CMO) adopted by the district court that is substantially similar to CMOs used in other Guantanamo habeas cases. Section I.F of the CMO requires the government to provide "on an ongoing basis any evidence contained in the material reviewed in developing the return . . . and in preparation for the hearing . . . that tends materially to undermine the Government's theory as to the lawfulness of the petitioner's detention." J.A. 1110. The CMO also states that requests for discovery must be narrowly tailored, that they must specify why the request is likely to produce evidence material to the petitioner's case, and that they must explain "why the burden on the Government to produce such evidence is neither unfairly disruptive nor unduly burdensome." CMO § 1.E (J.A. 1110). Obaydullah contends that the district court erred when it denied his motion to compel discovery of information relating to the reliability of the government's intelligence source that prompted

**PUBLIC COPY - CLASSIFIED INFORMATION DELETED**

the raid, and to the circumstances surrounding Obaydullah's interrogation during the raid. We review the district court's discovery rulings only for abuse of discretion. *See Al-Madhwani v. Obama*, 642 F.3d 1071, 1077 (D.C. Cir. 2011).

## A

Although the government has disclosed the classified pre-raid intelligence reports to Obaydullah's security-cleared counsel, it has redacted the source of this intelligence and any information describing the source.[14] The government contends that the source is highly sensitive – too sensitive, even, to reveal in its classified filings at the Secret level, to which Obaydullah's security-cleared counsel has access. U.S. Br. 10.

Obaydullah requested "[a]ll documents relating to the tip on which American forces were operating" when they conducted the raid, "including the nature of the tip and the identity of its source"; "[a]ny and all information regarding fees, bounties, or other monetary or non-monetary remuneration or consideration given to third parties for apprehension, transfer, or investigation of petitioner"; "[d]ocuments sufficient to show whether there was ever a bounty offered or paid for Obaidullah's capture"; and

---

[14]

PUBLIC COPY - CLASSIFIED INFORMATION DELETED

"[t]he identity, by name and any other identifying information, of any and all sources providing the [pre-raid] intelligence." Obaydullah Mot. to Compel Disc. at 6-7 (J.A. 1120-21). The government does "agree that money provided to a source in exchange for inculpatory information would generally be relevant and already encompassed within the government's disclosure obligation under CMO § I.F." U.S. Br. 41 n.21. But it insists it has complied with all of its obligations under the CMO and that it cannot disclose anything further to Obaydullah's counsel without jeopardizing highly sensitive, source-related information. *See* Gov't Response to Mot. to Strike at 4. The information at issue here, the government tells us, is classified as "Sensitive Compartmented Information" and "require[s] 'special controls and handling.'" *Id.* at 1 n.1 (quoting *Doe v. Cheney*, 885 F.2d 898, 902 n.2 (D.C. Cir. 1989)).

Obaydullah does not deny that the government may withhold classified national security material consistent with its "legitimate interest in protecting sources and methods of intelligence gathering." *Boumediene v. Bush*, 553 U.S. 723, 796 (2008). At oral argument, counsel for Obaydullah conceded that – notwithstanding counsel's security clearance at the Secret level – the government could withhold, as a hypothetical example, the name of a covert agent placed in a sensitive position, even if potentially relevant to the case. Here, the government submitted an *ex parte* filing to the court containing further information about its source. We have reviewed that material solely for the purpose of determining whether the government has met its obligations under the CMO, and not for the purpose – to which Obaydullah would object – of "bolster[ing] [the government's] case against" him, Obaydullah Mot. to Strike at 7. Finding that the government did not need to

**PUBLIC COPY - CLASSIFIED INFORMATION DELETED**

disclose further information about its source to Obaydullah's counsel, we conclude that the district court did not abuse its discretion in denying Obaydullah's discovery request.

## B

Obaydullah also contends that the district court improperly denied his discovery request for "evidence concerning coercion by U.S. forces who interrogated him *during* the July 2002 raid." Obaydullah Br. 32 (emphasis added). Obaydullah maintains that statements he gave during the raid and later retracted (that he was keeping the mines for "Karim," and that the notebook diagrams depicted wiring for a generator) were "likely the product of coercion." *Id.* at 37-38. As such, he argues that evidence of coercion would have been material to the court in rehabilitating his credibility.

In the district court, Obaydullah made a broad request for any information about his coercion or abuse at the hands of U.S. officials. The district court did not deny that request. To the contrary, it repeatedly made clear that the government was obligated to disclose *any and all* information relating to coercion. Hearing Tr. Aug. 20, 2010 (PM) at 20-21 (J.A. 2905-06). And, in fact, Obaydullah was given such information – specifically in relation to his detention at Chapman Airfield and at Bagram Airbase. *See* CITF reports and memoranda at J.A. 704-08, 713, 1859-61, 2485-86. Indeed, Obaydullah's allegations of abuse led the government to withdraw reliance on any statements he made at those airbases. U.S. Br. 13 n.9; *see* Hearing Tr. Sept. 30, 2010 (AM) at 28 (J.A. 3015).

**PUBLIC COPY - CLASSIFIED INFORMATION DELETED**

The government represents that there is no other evidence concerning coercion, whether during the raid or otherwise. The government did disclose various reports and debriefings regarding the raid – as well as ████████████████ ████████████████ We have examined this material and find it inconsistent with a claim that Obaydullah was mistreated during the raid. Accordingly, there is nothing that leads us to doubt the government's assertion that it complied with the district court's instruction to disclose any and all information relating to coercion.

## C

Finally, Obaydullah raises a number of legal challenges to the district court's standard of proof, its use of hearsay evidence, and its application of the AUMF. Those challenges are foreclosed by circuit precedent. *See Alsabri*, 2012 WL 2895585, at *10 (court may apply a preponderance of the evidence standard and may admit hearsay evidence); *Al Alwi*, 653 F.3d at 16 (listing cases affirming that the government may detain persons found to be "part of" al Qaeda). Obaydullah also argues that it is error for a district court to consider "coerced evidence," but that argument has no application to this case. As we have just explained, there is no evidence that Obaydullah's statements at the scene of the raid were the result of coercion, and the government disclaimed any reliance on statements as to which there was such evidence (namely, the statements at the airbases).

## V

For the foregoing reasons, we reject Obaydullah's challenge to the district court's conclusion that he was "part of" al Qaeda.

**PUBLIC COPY - CLASSIFIED INFORMATION DELETED**

We therefore affirm the court's determination that he is lawfully detained pursuant to the AUMF and its denial of his petition for a writ of habeas corpus.

*So ordered.*

SENTELLE, *Chief Judge*, dissenting: Although the majority's opinion accurately identifies the authorities relevant to the determination of whether we have jurisdiction to consider this appeal, I disagree regarding its conclusion, and, therefore, must respectfully dissent.

The existence of jurisdiction is the "first and fundamental question that we are bound to ask and answer." *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008) (internal quotation marks omitted). "The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception." *Id.* (internal quotation marks omitted). We are not at liberty to consider the merits of a case without first establishing that we have jurisdiction to do so.

The majority explains the procedural history of this case before the district court. Maj. Op. at 4-5. Briefly: The district court denied Obaydullah's habeas petition on November 30, 2010. Under Federal Rule of Civil Procedure 59(e), Obaydullah had 28 days to file a motion for reconsideration. Federal Rule of Civil Procedure 6(b) provides that the district court may not extend a party's time to act under Rule 59(e). But Obaydullah's counsel moved for, and the district court granted, a two-day extension to file Obaydullah's motion for reconsideration. In accordance with the mistaken extension, Obaydullah filed his Rule 59(e) motion on December 30, 2010—30 days after the district court entered the judgment. The district court denied the motion for reconsideration on March 24, 2011, and Obaydullah filed his notice of appeal on May 17, 2011.

In order for a United States court of appeals to have jurisdiction over a case in which the government is a party, a

party must file its notice of appeal from a district court judgment within 60 days after the entry of the judgment. 28 U.S.C. § 2107(a)-(b). Federal Rule of Appellate Procedure (FRAP) 4(a)(4)(A) provides, however, that "[i]f a party timely files in the district court any of the following motions under the Federal Rules of Civil Procedure, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion." One of those motions is a motion to alter or amend the judgment under Rule 59. Fed. R. App. P. 4(a)(4)(A)(iv).

Thus, had Obaydullah "timely fil[ed]" his Rule 59(e) motion for reconsideration, the motion would have tolled the time for him to file his notice of appeal regarding the underlying district court decision and we would have jurisdiction over his appeal of that decision. Obaydullah, however, did not timely file his Rule 59(e) motion, raising the question whether an untimely Rule 59(e) motion allowed to proceed by the district court and unchallenged by the government tolls the running of the 60-day time limit to file a notice of appeal. Based on the explicit terms of the jurisdictional statute and the rules themselves, it does not. My colleagues find support in case law for departing from the terms of the statute and the federal rules of civil and appellate procedure in order to exercise jurisdiction. The case law they cite leads me to the opposite conclusion.

In *Bowles v. Russell*, 551 U.S. 205 (2007), the Supreme Court considered whether a court of appeals had jurisdiction to consider an appeal of a decision after the district court purported to extend a party's time to file its appeal beyond the statutory 14-day period set out in 28 U.S.C. § 2107(c). 551 U.S. at 206-07. The district court had denied the habeas petition of Keith Bowles, a convicted murder. Under FRAP 4(a)(1)(A) and 28

U.S.C. § 2107(a), Bowles had 30 days to file a notice of appeal. He failed to do so, but later moved to reopen the period during which he could file his notice of appeal pursuant to FRAP 4(a)(6). *Bowles*, 551 U.S. at 207. That rule allows the district court to reopen the time to file a notice of appeal for 14 days under specified conditions. *See* 28 U.S.C. § 2107(c) (codifying the 14-day time period). The district court granted the motion, but gave Bowles 17 days to file his notice of appeal instead of the 14 days allowed by the statute and rule. Relying on *Browder v. Director, Department of Corrections*, 434 U.S. 257, 264 (1978), the Sixth Circuit held that it did not have jurisdiction to consider Bowles' appeal because the Supreme Court consistently had held that the timely filing of a notice of appeal is "mandatory and jurisdictional." *Bowles v. Russell*, 432 F.3d 668, 673 (6th Cir. 2005), *aff'd*, 551 U.S. 205 (2007).

Emphasizing that "the taking of an appeal within the prescribed time is 'mandatory and jurisdictional,'" the Supreme Court affirmed the Sixth Circuit's holding that it did not have jurisdiction to consider Bowles' appeal. *Bowles*, 551 U.S. at 209-10 (citation omitted). The Court explained that it long has treated statutory time limits for taking an appeal as jurisdictional requirements. *Id.* at 210. The amount of time by which a district court could reopen Bowles' time for taking an appeal was codified at 28 U.S.C. § 2107(c), and, thus, the Supreme Court held it to be a jurisdictional requirement.

Like the 14-day period in *Bowles*, the 60-day time limit to file a notice of appeal at issue in this case is set out in the Federal Rules of Appellate Procedure, Fed. R. App. P. 4(a)(1)(B), and codified in statute, 28 U.S.C. § 2107(b). There is no question that the 60-day period is jurisdictional. There is no question that the 60-day period was not met. We do not have

jurisdiction, and the petition should be dismissed.

As I understand the majority opinion, my colleagues believe that we must decide whether FRAP 4(a)(4)(A)(iv), which provides that a timely motion under Rule 59(e) tolls the running of the time to file a notice of appeal, is a claim-processing rule or a jurisdictional requirement. The majority reasons that if the requirement can be deemed a claim-processing rule, the parties may waive or forfeit the timeliness defect in filing the Rule 59(e) motion so that an untimely Rule 59(e) motion may toll the time to file a notice of appeal. While I doubt the propriety of raising this question at all, I believe the majority's answer to it is incorrect. The proper analysis of the question is governed by *Bowles*.

To reach its decision in *Bowles*, the Supreme Court addressed two of its previous cases that involved essentially the same question before this Court today—that is, whether a Rule 59(e) motion erroneously entertained by the district court despite its untimeliness tolls the statutory time limit for filing a notice of appeal.

The Court first clarified that *Browder v. Director, Dep't of Corrections*, 434 U.S. 257 (1978), is good law. In *Browder*, the Court explained that the time limit set for filing a notice of appeal in 28 U.S.C. § 2107 is "'mandatory and jurisdictional.'" *Browder*, 434 U.S. at 264 (quoting *United States v. Robinson*, 361 U.S. 220, 229 (1960)). The Court continued:

> The running of time for filing a notice of appeal may be tolled, according to the terms of Rule 4(a), by a timely motion filed in the district court pursuant to . . . Rule 59. Respondent's motion for a stay and an evidentiary hearing

5

was filed 28 days after the District Court's order directing
that petitioner be discharged. It was untimely under the
Civil Rules . . . and therefore could not have tolled the
running of time to appeal under [FRAP] 4(a). The Court of
Appeals therefore lacked jurisdiction to review the order of
October 21.

*Id.* at 264-65. In 2005, the Court questioned the use of the term
"jurisdictional" in *Browder, Robinson,* and other cases.
*Eberhart v. United States,* 546 U.S. 12, 17-18 (2005). But in
*Bowles,* in 2007, the Court cited *Browder*'s treatment of time
limits with approval. 551 U.S. at 209-10 & n.2. The Court
explained that its recent negative treatment of *Robinson* and
other cases, such as *Browder,* that relied on *Robinson* for the
proposition that the time limit set for a notice of appeal is
jurisdictional, was "dicta" and that "[g]iven the choice between
calling into question some dicta in our recent opinions and
effectively overruling a century's worth of practice, we think the
former option is the only prudent course." *Bowles,* 551 U.S. at
210 n.2 (internal punctuation omitted). Obaydullah's case fits
precisely within the holding of *Browder.*

In *Bowles,* the Supreme Court also explicitly overruled the
so-called "unique circumstances" holding it had announced in
*Harris Truck Lines, Inc. v. Cherry Meat Packers, Inc.,* 371 U.S.
215 (1962) (per curiam) and applied only once thereafter in
*Thompson v. INS,* 375 U.S. 384 (1964). *Bowles,* 551 U.S. at 214
("[W]e overrule *Harris Truck Lines* and *Thompson* to the extent
they purport to authorize an exception to a jurisdictional rule.").

In *Thompson,* the district court denied a party's petition for
naturalization. 375 U.S. at 384-85. Twelve days later, the
petitioner filed a motion for a new trial pursuant to Rule 59, *id.*

at 385, which, at that time, required such motions to be filed within 10 days of the entry of the final judgment. The Government did not object to the timeliness of that motion, however, and the district court declared that the motion was "made 'in ample time.'" *Id.* at 385. The district court denied the Rule 59 motion. Within 60 days of the denial of the Rule 59 motion, but not within 60 days of the original entry of judgment by the district court, the petitioner filed a notice of appeal. *Thompson*, 375 U.S. at 385. At that time, the 60-day time limit was prescribed by Federal Rule of Civil Procedure 73, which also provided that the time for appeal "commences to run and is to be computed from the entry of any of the following orders made upon a timely motion under such rules" including "granting or denying a motion under Rule 59 to alter or amend the judgment." *See id.* The Seventh Circuit Court of Appeals dismissed the appeal because it determined that petitioner's untimely post-trial motions did not toll the running of the time for appeal. *Id.*

The Supreme Court held that because the petitioner "did an act which, if properly done, postponed the deadline for the filing of his appeal" and "the District Court concluded that the act had been properly done," the case presented "unique circumstances" that would allow the Court of Appeals to exercise jurisdiction; the Court vacated and remanded the case to the Court of Appeals to hear the case on the merits. *Id.* at 387. This is precisely the rationale that the Supreme Court overruled in *Bowles*, 551 U.S. at 214, and precisely the rationale the majority appears to apply in this case. Obaydullah did an act—filing a Rule 59(e) motion— which, if properly done, postponed the deadline for filing his appeal, and the District Court gave permission for the act to be done improperly. If *Thompson* stood, Obaydullah would perhaps have presented "unique circumstances" that

would trump the statutory jurisdictional requirement. But because the Supreme Court expressly held in *Bowles* that such "unique circumstances" cannot outweigh jurisdictional requirements, I am compelled to reach the conclusion that we do not have jurisdiction over this matter.

If the Supreme Court's decision in *Bowles* did not exist, the majority might be correct that this Court's decisions in *Wilburn v. Robinson*, 480 F.3d 1140 (D.C. Cir. 2007), and *Youkelsone v. FDIC*, 660 F.3d 473 (D.C. Cir. 2011), should control our reasoning here. *Wilburn*, however, was decided before *Bowles*, and *Youkelsone* fails to even mention *Bowles*. Both address different rules than the ones at issue in this case. Further, this Court also has decided *In re Sealed Case (Bowles)*, 624 F.3d 482 (D.C. Cir. 2009), which, relying on the Supreme Court's (unrelated) *Bowles*, held that a claim-processing rule cannot be used to circumvent the jurisdictional time limit of 21 U.S.C. § 2107(a). *In re Sealed Case (Bowles)*, 624 F.3d at 486.

We need not delve deeply into the circuit precedent, however, because the Supreme Court's binding decisions should control the outcome here: *Bowles* overruled *Thompson* and put *Browder* back on solid ground, and *Bowles* and *Browder*, which directly addresses the question raised here, should govern this case. They dictate that this Court does not have jurisdiction over Obaydullah's appeal.

I respectfully dissent.