# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 8, 2015       Decided November 13, 2015

No. 13-5286

SHARIF MOBLEY,
APPELLANT

v.

CENTRAL INTELLIGENCE AGENCY, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-02072)
(No. 1:11-cv-02073)

---

*Kelly B. McClanahan* argued the cause and filed the briefs for appellant.

*Mark S. Zaid* was on the brief for *amicus curiae* J. William Leonard in support of appellant.

*H. Thomas Bryon III* argued the cause for appellees. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Vincent Cohen, Jr.*, Acting U.S. Attorney, and *Matthew Collette*, Attorney.

Before: ROGERS, BROWN and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Sharif Mobley seeks information relating principally to his detention in Yemen from four federal agencies. After submitting requests pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act, *id.* § 552a, Mobley filed two lawsuits to compel disclosure. The district court granted summary judgment to the agencies and denied Mobley's motion for reconsideration. Although his appeal presents a thorny jurisdictional question, upon determining that this court has jurisdiction to consider the appeals in both of his cases, we conclude that Mobley's contentions fail on the merits under a straightforward application of our precedent. We therefore affirm.

**I.**

Mobley, a United States citizen, Cmpt. ¶ 3, has been detained in Yemen since January 26, 2010. According to one of his attorneys, he was abducted from the streets of Sana'a, Yemen's capital city, by eight armed men who forced him into a van, shooting him twice in the process. Decl. Cori A. Crider, ¶¶ 1, 8–16 (July 21, 2010). Mobley had lived in Sana'a with his family since 2008, but in January 2010, he contacted U.S. Embassy officials to arrange for return to the United States. *Id.* ¶¶ 11–13. While in custody, Mobley claims that he was interrogated by agents from the Federal Bureau of Investigation ("FBI"), the Defense Department, and other unspecified U.S. federal agencies. *Id.* ¶¶ 32–51. Although it remains unclear to Mobley why he was initially detained, *id.* ¶ 11, he is being held on allegations that he shot two hospital guards — one fatally — during an attempted escape while he was being treated for injuries sustained during his abduction and detention, *id.* ¶¶ 26–54.

On July 22, 2010, Mobley submitted an information request, pursuant to FOIA and the Privacy Act, to various federal agencies, including the FBI, the Central Intelligence Agency ("CIA"), the Department of Defense, and the Department of State. He sought information on: (1) his abduction; (2) the involvement of various federal agencies in his abduction and interrogation; and (3) the "wider pattern of U.S.-sponsored sweeps and proxy detention in Yemen from January 2010, of which [his] seizure is a part." FOIA/Privacy Act Request at 2 (July 22, 2010). In addition, he sought "all records in any way relating to, pertaining to, or mentioning [Mobley] by any and all persons or entities, including all persons acting on behalf of the United States." Over a year later, Mobley's counsel sent two e-mails to the FBI, before it had responded to his original request, asking that it search particular repositories of analog and digital records, which we refer to as record systems.

On November 22, 2011, Mobley filed two lawsuits in the federal district court. *See* 5 U.S.C. § 552(a)(4)(B); *id.* § 552a(g)(1)(B). In the first he sued the Justice Department and the Defense Department. The following spring the FBI partially released to Mobley 85 pages of responsive records, withholding portions pursuant to FOIA Exemptions 1, 6, and 7(C) and Privacy Act Exemption (j)(2). *See* Decl. Dennis J. Argall, Assistant Section Chief, Records/Info. Dissemination Section, FBI, ¶¶ 24, 34 (June 29, 2012) ("First Argall Decl."). We will refer to this lawsuit as the FBI case. In the second lawsuit, he sued the CIA and the State Department. Although Mobley sent the CIA the same information request that he sent the FBI, the Defense Department, and the State Department, he also sent the CIA a separate request, on August 15, 2011, for "all [CIA] records about Mr. Mobley and [his wife]." The appeal in his second lawsuit involves only the CIA's response to the August 15 request, and we will refer to the second lawsuit as the CIA

case. The CIA released some responsive records, which the Defense Intelligence Agency ("DIA") had referred to it in response to Mobley's information requests to the Defense Department. Decl. Michele L. Meeks, Chief, Pub. Info. Programs Div., CIA, ¶¶ 5–9 (Sept. 4, 2012). The CIA withheld six of the DIA documents under FOIA Exemption 3, *id.* ¶ 7, and as not subject to disclosure under the Privacy Act, Decl. Alesia Y. Williams, Chief, FOIA Servs. Section, DIA, ¶ 4 (Oct. 12, 2012).

The district court ruled on the government's motions for summary judgment in both cases in a single memorandum opinion of February 7, 2013. *See Mobley v. CIA*, 924 F. Supp. 2d 24, 74 (D.D.C. 2013). The court granted summary judgment in full to the defendants, with the exception of the CIA, and in the FBI case entered "a final and appealable Order." Although it rejected most of Mobley's challenges to the CIA's search for responsive records and decisions to withhold certain information, the district court ordered the CIA to conduct a supplemental search in the Director of National Intelligence's Open Source Center ("OSC") and to release any non-exempt records it located, *id.* at 37–38. The CIA subsequently filed a joint notice regarding OSC records. On June 7, 2013, the district court granted summary judgment in full in the CIA case and directed that case be closed. Four days later, the district court consolidated Mobley's two lawsuits.

On June 17, 2013, Mobley moved for reconsideration on the grounds that the district court erred by failing to: (1) require the FBI to search its e-mail systems; (2) require the CIA to disclose six of the documents referred to it by the DIA; and (3) conduct *in camera* review of two pages of responsive records withheld by the FBI. The district court treated Mobley's motion as filed

pursuant to Federal Rule of Civil Procedure 59(e),[1] and denied reconsideration on August 7, 2013.

Mobley appeals. Our review of the grant of summary judgment is *de novo*. *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007). Our review of the denial of a Rule 59(e) motion is for abuse of discretion, *see Messina v. Krakower*, 439 F.3d 755, 759 (D.C. Cir. 2006), as is the decision not to inspect *in camera* documents withheld under a FOIA exemption, *Larson v. Dep't of State*, 565 F.3d 857, 869–70 (D.C. Cir. 2009). In light of our recent decision in *DiBacco v. U.S. Army*, 795 F.3d 178 (D.C. Cir. 2015), Mobley has withdrawn his appeal regarding the DIA and several challenges to the district court's rulings regarding the CIA.

## II.

The court must first address the threshold question of whether it has jurisdiction to consider Mobley's challenges to the district court's grants of summary judgment in the FBI and the CIA cases. Our review of jurisdictional issues is *de novo*, *Foretich v. ABC*, 198 F.3d 270, 273 (D.C. Cir. 1999), and this includes whether Mobley's Rule 59(e) motion was timely filed, *Winslow v. FERC*, 587 F.3d 1133, 1135 (D.C. Cir. 2009). The jurisdictional issue is complicated by the district court's decision not to consolidate the FBI and CIA cases until after it had granted summary judgment in both cases. It is also complicated by the fact that upon granting summary judgment in the FBI case on February 7, 2013, the district court also entered "a final

---

[1] Federal Rule of Civil Procedure 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."

and appealable Order." *See* FED. R. CIV. P. 58(a).[2]  The district court did not enter such an order in the CIA case until it granted summary judgment in full on June 7, 2013.  Mobley filed his notice of appeal on September 16, 2013.  The timeliness of Mobley's appeal therefore depends on whether his motion for reconsideration under Rule 59(e) was timely filed.  If so, then his time to file a notice of appeal was tolled.  FED. R. APP. P. 4(a)(4)(A)(iv).  If not, then Mobley's appeal of summary judgment in the FBI case was also untimely, and this court lacks jurisdiction.

**A.**

Because timing is central to the jurisdiction question, a brief chronology of the relevant events follows.  As noted, on February 7, 2013, the district court granted summary judgment in the FBI case and entered a final, appealable order, *see* FED. R. CIV. P. 58(a).  At the same time, in the CIA case, it granted summary judgment to the State Department, but granted summary judgment only in part to the CIA, remanding for the CIA to conduct a supplemental records search.  Shortly thereafter, on February 19, the district court denied a consent motion to consolidate the cases without prejudice, on the ground that the cases were not in the same procedural posture; the FBI case was closed while the CIA case remained open.

A week later, Mobley filed, in light of the "high degree of overlap between these cases," a motion to stay the FBI case until the district court had finally resolved the CIA case, so that the "motions for reconsideration or appeals to the D.C. Circuit" in both cases could be filed and adjudicated at the same time.  The

---

[2]  Federal Rule of Civil Procedure 58(a) provides that "[e]very judgment and amended judgment must be set out in a separate document," subject to exceptions inapplicable here.

district court granted the motion and stayed the FBI case until "a final appealable order has been issued" in the CIA case.

On June 7, 2013, the district court granted summary judgment in full in the CIA case and entered a final, appealable order.  It also lifted the stay in the FBI case.  Four days later, it consolidated the two cases.

On June 17, 2013, Mobley moved for partial reconsideration, pursuant to Federal Rules of Civil Procedure 59(e) and 60(b).  Although the government neither opposed Mobley's motion for a stay nor objected to the district court's stay order, it opposed his motion for reconsideration as untimely in the FBI case.  The district court, which treated Mobley's motion as filed pursuant to Rule 59(e), acknowledged that it lacked authority to extend the filing deadline for a Rule 59(e) motion.  Mem. & Order at 7–8 (Aug. 7, 2013) (citing FED. R. CIV. P. 6(b)(2),[3] *Derrington-Bey v. D.C. Dep't of Corr*., 39 F.3d 1224, 1225 (D.C. Cir. 1994), and *Ctr. for Nuclear Responsibility, Inc. v. U.S. Nuclear Regulatory Comm'n*, 781 F.2d 935, 941 (D.C. Cir. 1986)).  But the court concluded that its stay power, which is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants," *id.* at 8 (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)), had "halted" the proceedings in the FBI case until the court issued a final appealable order in the CIA case, *id*.  In other words, the district court concluded that its stay order did not "extend" the time to file a Rule 59(e) motion within the meaning of Rule 6 because its stay order was an exercise of its

---

[3] Federal Rules of Civil Procedure 6(b)(2) provides that "[a] court must not extend the time to act under Rules 50(b) and (d), 52(b), 59(b), (d), and (e), and 60(b)."

inherent power to manage its docket. Having found Mobley's Rule 59(e) motion timely filed, the district court denied it on the merits on August 7, 2013. Mobley filed his notice of appeal on September 16, 2013.

**B.**

The government, while acknowledging Mobley's appeal of the denial of his motion for reconsideration is timely, suggests that this court's jurisdiction over the grants of summary judgment of February 7 and June 7 is "less clear," Appellees' Br. 2. For the following reasons, we conclude the court has jurisdiction over the entirety of Mobley's appeal.

**1.** With regard to the FBI case, the government declined, curiously, to take a position on whether the court lacks jurisdiction. Presumably, the government's summarily stated intimation is based on the fact that where one of the parties is a United States agency, a notice of appeal must be filed within 60 days after entry of the judgment or order appealed. FED. R. APP. P. 4(a)(1)(B)(ii). That time began to run in the FBI case when the district court entered the Rule 58(a) order on February 7, 2013. *Id.* 4(a)(7)(A)(ii).[4] Only if Mobley timely filed a Rule 59(e) motion — that is, within 28 days of the grant of summary judgment — would the time to appeal not begin to run until the

---

[4] Federal Rule of Appellate Procedure 4(a)(7)(A) provides that "[a] judgment or order is entered for purposes of this Rule 4(a) . . . (ii) if Federal Rule of Civil Procedure 58(a) requires a separate document, when the judgment or order is entered in the civil docket . . . and when . . . the judgment or order is set forth on a separate document . . . ."

entry of the order disposing of his motion. *Id.* 4(a)(4)(A)(iv).[5] The government opposed Mobley's Rule 59(e) motion as untimely. Were the government correct, then Mobley would have had to file his appeal in the FBI case within 60 days of February 7, 2013, and because he did not, this court would lack jurisdiction.

Notwithstanding the government's demurrer, this court must satisfy itself of its jurisdiction. *Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012). We agree with the district court that Mobley's Rule 59(e) motion was timely filed in the FBI case but for a different reason, which avoids addressing the complex interaction between the district court's inherent stay power, Rule 6(b)(2), and Rule 58(a). Instead, we conclude we have jurisdiction under the unique circumstances doctrine, which affords the opportunity, in view of the non-jurisdictional nature of the federal rules at issue, to excuse the tardiness of a late-filed Rule 59(e) motion.

Prior to *Bowles v. Russell*, 551 U.S. 205 (2007), the unique circumstances doctrine permitted appellate courts to excuse untimeliness where a party acted belatedly in reliance on an erroneous district court ruling. *See Thompson v. INS*, 375 U.S. 384 (1964); *Harris Truck Lines, Inc. v. Cherry Meat Packers, Inc.*, 371 U.S. 215 (1962). The doctrine, however, applied "only where a party who could have filed a timely notice of appeal is

---

[5] Federal Rule of Appellate Procedure 4(a)(4)(A) provides:

If a party timely files in the district court any of the following motions under the Federal Rules of Civil Procedure, the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion: . . .

(iv) to alter or amend the judgment under Rule 59; . . . .

lulled into missing the deadline by a formal court order or ruling, containing specific assurances that action which extends or postpones the deadline has properly been taken . . . ." *Moore v. S.C. Labor Bd.*, 100 F.3d 162, 162 (D.C. Cir. 1996); *see also Osterneck v. Ernst & Whinney*, 489 U.S. 169, 179 (1989). In *Bowles*, 551 U.S. at 214, the Supreme Court expressly overruled *Thompson* and *Harris Truck Lines* and rejected the unique circumstances doctrine, but only "to the extent [it] purport[s] to authorize an exception to a jurisdictional rule." *Id.* That qualifying dependent clause left open the doctrine's continued vitality as an exception to a non-jurisdictional rule. *Cf. Gutierrez v. Johnson & Johnson*, 523 F.3d 187, 198–99 & n.10 (3d Cir. 2008); *see also United States v. Garduno*, 506 F.3d 1287, 1291–92 & n.5 (10th Cir. 2007); 4B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1168 (4th ed. 2008); 16A *id.* § 3950.1.

"Only Congress may determine a lower federal court's subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004). Timing rules are therefore jurisdictional if they implement a statutory time limit, whereas timing rules lacking a statutory basis are "simple 'claim-processing rule[s]'" subject to waiver and forfeiture. *Bowles*, 551 U.S. at 213. The timing rules at issue here — Federal Rules of Civil Procedure 6(b)(2) and 59(e) and Federal Rule of Appellate Procedure ("FRAP") 4(a)(4)(A)(iv) — are claim-processing rules. *Obaydullah v. Obama*, 688 F.3d 784, 788–91 (D.C. Cir. 2012); *see also Eberhart v. United States*, 546 U.S. 12, 19 (2005); *Kontrick*, 540 U.S. at 454; *Wilburn v. Robinson*, 480 F.3d 1140, 1146 n.11 (D.C. Cir. 2007); *Advanced Bodycare Solutions, LLC v. Thione Int'l, Inc.*, 615 F.3d 1352, 1359 n.15 (11th Cir. 2010); *Lizardo v. United States*, 619 F.3d 273, 274 (3d Cir. 2010); *Dill v. Gen. Am. Life Ins. Co.*, 525 F.3d 612, 618 (8th Cir. 2008); *Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 475 (6th Cir.

2007); *In re Onecast Media, Inc.*, 439 F.3d 558, 562 (9th Cir. 2006).

Unique circumstances excuse Mobley's untimely filing of his Rule 59(e) motion. On the same day, Mobley filed two complaints in the district court seeking virtually the same relief under FOIA and the Privacy Act. Except for the federal agencies he sued as defendants, his two complaints were grounded in functionally identical FOIA and Privacy Act requests. The district court's treatment of the two cases reflects their near-equivalence. Most notably, the district court issued a single memorandum opinion ruling on the defendants' motions for summary judgment in both cases. Mobley and the government, which consented to Mobley's motion to consolidate, agreed that, in view of anticipated post-judgment motions and appeals, the most efficient way to proceed was for the district court to handle both cases as one. Indeed, Mobley tried in two different ways to have the district court formally treat his two cases the way it was treating them in practice — as a single case. The second effort — his stay motion — succeeded. The district court entered an order staying the FBI case until it entered a final, appealable order in the CIA case.

A litigant in Mobley's position would reasonably have concluded that he could delay filing a Rule 59(e) motion until after the district court had finally ruled on the motion for summary judgment in the CIA case, closing that case, without jeopardizing his opportunity to appeal the grant of summary judgment in the FBI case. The court had entered a stay order in response to his request to align post-judgment motion practice in his two cases, and the opposing parties did not object. Thus, Mobley missed the deadline for filing a Rule 59(e) motion in the FBI case in reliance on a stay order that, in view of his stated reason for seeking a stay, provided specific assurances that he

would not need to file post-judgment motions until after the district court lifted the stay.

Under the unique circumstances doctrine, because no jurisdictional rule is implicated, Mobley's Rule 59(e) motion was timely filed and therefore tolled the time for filing a notice of appeal of the February 7 order in the FBI case  until the district court ruled on his Rule 59(e) motion.  FED. R. APP. P. 4(a)(4)(A)(iv), *see supra* note 5.  Mobley needed only to "file[] his notice of appeal within 60 days after the district court denied his Rule 59(e) motion," *Obaydullah*, 688 F.3d at 788, which he did.

Our conclusion that the court has jurisdiction is reinforced by an alternative basis for that conclusion, which would involve treating the district court's grant of Mobley's unopposed motion for a stay as a motion for extension of time under FRAP 4(a)(5)(C).[6]  Although the 60-day period for taking an appeal in FRAP 4(a)(1)(B) is based on 28 U.S.C. § 2107(b), and is therefore jurisdictional, *see Obaydullah*, 688 F.3d at 788, this court has distinguished that provision from other provisions in FRAP 4(a).  Under FRAP 4(a)(5)(A)(i), the district court may extend the time to file a notice of appeal, but FRAP 4(a)(5)(C) limits such extensions to 30 days.  In granting a stay that contemplated prolonging the time to file an appeal, the district court effectively extended the time to appeal beyond the 30-day limit.  FRAP 4(a)(5)(C)'s 30-day cap, however, unlike FRAP 4(a)(1)(B), is a claim-processing rule. *Youkelsone v. FDIC*, 660 F.3d 473, 475–76 (D.C. Cir. 2011).  Objections based on FRAP

---

[6]  Federal Rule of Appellate Procedure 4(a)(5)(C) provides:

No extension under this Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later.

4(a)(5)(C) therefore can be forfeited or waived. The government did not object to either Mobley's motion for a stay or to the stay order as an over-long extension of the time to appeal, and Mobley delayed noting his appeal in the FBI case in reliance on the stay order. The government therefore forfeited any timeliness objection to Mobley's filing a notice of appeal. For largely the same reasons that the unique circumstances present here render Mobley's Rule 59(e) motion timely, they also compel the conclusion that the time for filing a notice of appeal had not expired before Mobley filed his Rule 59(e) motion.

*In re Sealed Case (Bowles)*, 624 F.3d 482 (D.C. Cir. 2009), does not require a contrary conclusion regarding this court's jurisdiction over Mobley's appeal. There, the court held that even though Rule 60(b) is a claim-processing rule, a party cannot use it to circumvent FRAP 4(a)(6), which limits the time to reopen the window for filing an appeal after it has closed. *Sealed Case*, 624 F.3d at 486–87. But our conclusion that jurisdiction exists here rests on claim-processing rules, either Rule 59(e) or FRAP 4(a)(5)(C). By contrast, the rule at issue in *Sealed Case*, FRAP 4(a)(6), is jurisdictional. *Bowles*, 551 U.S. at 213; *Sealed Case*, 624 F.3d at 483. There is no evidence that Mobley is deploying "sham maneuvers . . . to avoid hard jurisdictional deadlines . . . ." *Sealed Case*, 624 F.3d at 483. Rather, much as the district court's analysis of its stay power reflects, Mobley sought and relied on the stay order out of a good-faith interest in litigation efficiency and judicial economy. *See* Mem. & Order at 8 (Aug. 7, 2013).

The government's remaining objection, to the manner in which the district court counted the 28-day period for filing a Rule 59(e) motion, also fails. The government maintains that even if the stay tolled the time to file a Rule 59(e) motion, the district court ought not to have excluded from the Rule 59(e)

period February 26, the day the court entered the stay order. Oddly, at the same time as it puts forward this argument, the government calls into question the argument's relevance:  In a footnote in its brief, it states that "[i]t is not clear whether [the time computation rules at issue] apply by their terms because the term of the stay was not a 'period . . . stated in days or a longer unit of time.'" Appellees' Br. 4 n.2 (quoting FED. R. CIV. P. 6(a)(1)(A) and FED. R. APP. P. 26(a)(1)(A)).  No matter.  Even applying the counting rules in Rule 6 and FRAP 26, the Rule 59(e) motion was timely.  The inclusion or exclusion of February 26 is irrelevant.  Counting February 26 against Mobley's 28 days, the last day Mobley could have filed his motion was June 15 or 16, depending on whether the tally includes June 7, the day the district court lifted the stay.  June 15, 2013, was a Saturday, and June 16 was a Sunday.  Mobley therefore had until the end of the day the following Monday to file his motion.  FED. R. CIV. P. 6(a)(1)(C).[7]  That Monday was June 17, the day Mobley filed his motion.

As a final point, we note that some of the complexity of the jurisdictional question presented here could have been avoided had the district court stayed entry of the Rule 58(a) order in the FBI case until entry of a final, appealable order in the CIA case, instead of staying the FBI case after entering the Rule 58(a) order.  This would not interfere with the district court's control of its docket, and it would avoid the need to consider the interrelationship between Rules 6(b)(2) and 58(a) and the district court's inherent stay power.

---

[7]  Federal Rule of Civil Procedure 6(a)(1) provides that "[w]hen the period is stated in days or a longer unit of time: . . . (C) include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday."

**2.** There is no merit to the government's suggestion this court lacks jurisdiction to address Mobley's appeal of the June 7, 2013, order granting summary judgment in full in the CIA case. Although the government's briefing on this point is not a model of clarity, its argument appears to be that Mobley has forfeited his challenge to the district court's February 7 partial grant of summary judgment to the CIA by failing to mention, in his notice of appeal, the June 7 Rule 58(a) order that made the February 7 summary judgment ruling in the CIA case final and appealable. The notice of appeal requirements in FRAP 3 are jurisdictional. *See Gonzalez*, 132 S. Ct. at 652.

"This circuit adheres to the 'rule that a mistake in designating the specific judgment or order appealed from should not result in loss of the appeal as long as [1] the intent to appeal from a specific judgment can be fairly inferred from the appellant's notice (and subsequent filings) and [2] the opposing party is not misled by the mistake.'" *Messina*, 439 F.3d at 759 (quoting *Foretich*, 198 F.3d at 273 n.4). The second prong is quickly disposed of. There is no indication that the government was misled about Mobley's intent, for it has fully briefed the issues he raised with respect to the CIA.

Under the first prong, Mobley plainly intended to appeal the grant of summary judgment to the CIA. He appended to his notice of appeal the February 7 summary judgment order, which addressed not only the FBI case but granted summary judgment to the State Department and partial summary judgment to the CIA. Further, this court has looked to filings other than the notice of appeal to establish intent, including an appellant's statement of issues, *Sinclair Broad. Grp. v. FCC*, 284 F.3d 148, 158 (D.C. Cir. 2002), and Mobley's statement of issues challenged several rulings in favor of the CIA made by the district court in its February 7 summary judgment order. Specifically, he identified in paragraphs 6 and 9 of his statement

of issues the district court's ruling that the CIA had not waived its so-called *Glomar* response and that the CIA's invocation of the response was procedurally sound. *Mobley*, 924 F. Supp. 2d at 45–50.

We turn to the merits of Mobley's contentions.

## III.

FOIA mandates disclosure of agency records upon request, unless they are subject to one of the nine statutory exemptions. *See Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011); *see also* 5 U.S.C. §§ 552(a)(3)(A), (b)(1)–(9). "In order to obtain summary judgment the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). This court applies a reasonableness standard to determine whether an agency performed an adequate search, *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998), and our review is heavily fact-dependent, *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983). The agency bears the burden of justifying the applicability of FOIA exemptions, which are exclusive and must be narrowly construed. *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015).

## A.

**Adequacy of search.** Mobley contends the district court erred in ruling that the FBI had performed an adequate search in response to his FOIA request. Our review of the adequacy of an agency's search is *de novo*. *See Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999). The court may rely on a "reasonably detailed affidavit, setting forth the search terms

and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby*, 920 F.2d at 68. Agency affidavits — so long as they are "relatively detailed and non-conclusory" — are "accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)).

Over a year after Mobley's initial request for all records pertaining to him, his attorney sent two e-mails to the FBI requesting that it search specific record systems. Among them were all "shared drives," in particular those for FBI headquarters and the New Jersey and New York Field Offices, and record systems located in the Washington and Baltimore Field Offices. One of the e-mails linked to a news story attributing to the FBI the statement that the Baltimore Field Office was working on Mobley's case. In response to Mobley's request, the FBI searched its Central Records System ("CRS") and Electronic Surveillance ("ELSUR") Indices. Generally, Mobley maintains that the FBI was required to search — or explain in greater detail than it did why it did not search — the record systems he asked it to search. In addition, although Mobley did not specifically ask the FBI to search e-mail systems, he insists the FBI was required to search them as record systems reasonably likely to contain responsive materials.

The detailed declarations of Dennis J. Argall, the assistant section chief of the FBI's Record/Information Dissemination Section, demonstrate that the FBI's search was adequate. Among other things, Argall explains the automation of the CRS in the 1990s and describes the wide array of databases incorporated into it, such that the CRS houses "all information which [the FBI] acquire[s] in the course of fulfilling its

mandated law enforcement responsibilities." First Argall Decl. ¶¶ 25–30; Decl. Dennis J. Argall, Assistant Section Chief, Records/Info. Dissemination Section, FBI, ¶¶ 3–9 (Oct. 12, 2012) ("Second Argall Decl."). He sets out in detail what search terms the FBI employed, and concludes that the FBI's search of the CRS — alongside its search of the ELSUR Indices — was reasonably likely to produce the information Mobley requested. Second Argall Decl. ¶ 9b.

Argall explains further that the specific record systems Mobley asked the FBI to search either are captured by the CRS or are unlikely to contain responsive records. *Id.* ¶¶ 3–9. Likewise, he states that e-mail systems also are not reasonably likely to result in additional responsive records because the records in them are redundant of records stored in the CRS. *Id.* ¶ 9b. Moreover, according to Argall, some record systems that Mobley asked the FBI to search — the so-called "I-Drive" and "tickler" files — are no longer in use. In 2001, all FBI field offices were instructed to perform comprehensive searches of the I-Drives in order to determine if I-Drive files were already in the FBI's automated search system. *Id.* ¶ 9a. If they were not, those files were added to that system, and thereafter the I-Drive was eliminated. *Id.* As for "tickler" files, they are "historical in nature," and the FBI no longer requires that they be created or maintained. *Id.* ¶ 7. The files were duplicates that contained copies of documents already indexed in the CRS. Regarding the newspaper story about the Baltimore Field Office, Argall states that access to CRS files in FBI field offices is also obtained through the general CRS search. First Argall Decl. ¶ 27. Additionally, if an exclusion has been employed in this case, it has been amply justified by the *in camera*, *ex parte* declaration submitted by the FBI.

Mobley's specific challenges to the adequacy of the FBI's search and the good faith of Argall's declarations are thus

unpersuasive. Had the FBI only searched the record systems "most likely" to contain responsive records, its search would be inadequate. *See DiBacco*, 795 F.3d at 190; *Oglesby*, 920 F.2d at 68. But, as Mobley concedes, that is not what the FBI's declarations state it did here. Still, Mobley insists his selective close reading of Argall's declarations, taken alongside FBI declarations in other FOIA cases, demonstrates that Argall's declarations actually say that the FBI limited its search to the record systems "most likely" to contain responsive records. Neither Argall's words nor the FBI declarations that Mobley identified from other FOIA cases call into question the good faith of Argall's representations. Although Mobley may believe that Argall's sworn statements are disingenuous, he has offered no basis on which this court could conclude the presumption of good faith has been overcome.

Further, a request for an agency to search a particular record system — without more — does not invariably constitute a "lead" that an agency must pursue. A "lead" must be "both clear and certain" and "so apparent that the [FBI] cannot in good faith fail to pursue it." *Kowalczyk v. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996). For example, in *Campbell*, 164 F.3d at 27–28, the court held that the FBI could not decline to search beyond the CRS where records in the CRS themselves indicated that there were undiscovered responsive records located in other record systems. *Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999), on which Mobley relies by analogy, is in alignment with this court's precedent. *Id.* at 288–89. By contrast, Mobley's demand that the FBI search certain record systems is generally mere fiat. To the extent it is not, as noted, the Argall declarations demonstrate the FBI conducted an adequate search. In any event, under Mobley's approach, which would allow a requester to dictate, through search instructions, the scope of an agency's search, the reasonableness test for search adequacy long adhered to in this circuit would be

undermined. *Cf. DiBacco*, 795 F.3d at 191 (citing *SafeCard Servs.*, 926 F.2d at 1201). Although an agency may not ignore a request to search specific record systems when a request reaches the agency before it has completed its search, *cf. Campbell*, 164 F.3d at 28, a search is generally adequate where the agency has sufficiently explained its search process and why the specified record systems are not reasonably likely to contain responsive records, *see id.* at 27–28; *Oglesby*, 920 F.2d at 68. As noted, the FBI did just that.

Additionally, the FBI has no responsibility to pursue leads that might be contained in documents released by other agencies where it does not become aware of those documents until after it has completed its search. *See Campbell*, 164 F.3d at 28; *Kowalczyk*, 73 F.3d at 389. Mobley maintains that the redacted e-mails released by the State Department, on the same day and through the same counsel as the FBI release, demonstrate that the FBI failed to pursue relevant leads in its search. But Mobley provides no evidence that the FBI was aware of those leads in the State Department e-mails before completing its search. Because agencies are not required to perform additional searches once their search is concluded, the court cannot conclude that the FBI failed to conduct an adequate search.

Finally, the FBI's search, under FOIA, "is not unreasonable simply because it fails to produce all relevant material . . . ." *Meeropol v. Meese*, 790 F.2d 942, 952–53 (D.C. Cir. 1986); *see also Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004); *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003); *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 892 n.7 (D.C. Cir. 1995); *SafeCard Servs.*, 926 F.2d at 1201. Over objections similar to Mobley's, the court upheld the adequacy of a search although it failed to discover an entire category of records about a secret meeting that, according to the requester, was "of such importance that records must have been

created." *DiBacco*, 795 F.3d at 190; *see also Oglesby*, 920 F.2d at 67 n.13. In the absence of any supporting evidence, Mobley's argument that files predating his arrest must have existed also fails to raise a material question of fact regarding the adequacy of the search.

**B.**

**Waiver by official acknowledgment.** Mobley contends that the FBI and CIA waived their application of FOIA Exemption 1 to certain information through official acknowledgment of that exempt information. Exemption 1 shields from disclosure records that may be and are properly classified, thus removing from FOIA's scope "matters that are . . . specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). But "when information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim." *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990). A three-part test determines whether an item is "officially acknowledged": (1) "the information requested must be as specific as the information previously released"; (2) "the information requested must match the information previously disclosed"; and (3) "the information requested must already have been made public through an official and documented disclosure." *Id.*

The plaintiff bears the burden of identifying specific information that is already in the public domain due to official disclosure. *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007); *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983). Mobley has not carried that burden. First, Mobley points to a document filed by a private party in a Yemeni court proceeding. According to Mobley, the FBI had given the interview record to

the Yemeni government without any restrictions on its use, and the Yemeni government, in turn, had provided it to the party that filed it in court. Even assuming the truth of his claims, the district court did not err in ruling there had been no official acknowledgment of the document. Disclosure by one federal agency does not waive another agency's right to assert a FOIA exemption. *Frugone v. CIA*, 169 F.3d 772, 774–75 (D.C. Cir. 1999). By parity of reasoning it follows that a foreign government also cannot waive a federal agency's right to assert a FOIA exemption. It is more difficult still to understand how disclosure by private litigants in a foreign court proceeding could constitute official acknowledgment. That kind of disclosure is no more "official" than the disclosure of information by former CIA agents and officers acting with the blessing of that agency's pre-publication review process, and this court has held the latter insufficiently official to trigger waiver. *Afshar*, 702 F.2d at 1133–34.

Second, Mobley contends that an error in the CIA's FOIA office waived reliance on its Exemption 1 *Glomar* response. An agency asserts a *Glomar* response when it refuses to confirm or deny the very existence of responsive records. The name finds its source in *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976), which involved the CIA's refusal to confirm or deny the existence of documents pertaining to the *Glomar Explorer*, a ship the U.S. government allegedly had deployed in an effort to recover a sunken Soviet submarine. *See Am. Civil Liberties Union v. CIA*, 710 F.3d 422, 426 n.1 (D.C. Cir. 2013). Here, Mobley locates waiver in the first of two final response letters he received from the CIA. A September 20, 2011, letter from the CIA states that (1) the agency had located responsive records but was withholding them in full based on two FOIA and two Privacy Act exemptions, and (2) as to any records that "reveal[ed] a classified connection to the CIA," it was asserting a *Glomar* response. On January 11, 2012, the CIA issued an

"amended final response" stating that (1) the September 20 letter "contained inaccuracies" as to the CIA's search; (2) in fact, its search turned up no "responsive records that might reflect an open or otherwise acknowledged [CIA] affiliation"; and (3) its *Glomar* response applied to "a classified connection to the CIA." Mobley maintains that the first CIA letter constitutes official acknowledgment that the CIA possesses records responsive to his FOIA request that reveal a classified connection between him and the CIA. That, in Mobley's view, waived the *Glomar* response the CIA relied on in its second letter.

A *Glomar* response is proper only if "the fact of the existence or nonexistence of agency records falls within a FOIA exemption," *Wolf*, 473 F.3d at 374, and like other information withheld pursuant to an exemption, an agency can waive a *Glomar* response through official acknowledgment, *id.* at 378. The Chief of the Public Information Programs Division at the CIA stated in a sworn declaration that the September 20 letter was "mistakenly issued" and "contained inaccuracies regarding the results of the CIA's search," an "error" that the CIA did not notice until after Mobley appealed the agency's response. Decl. Michele L. Meeks, Chief, Pub. Info. Programs Div., CIA, ¶¶ 21–22 (May 25, 2012); *see also* Supplemental Decl. Michele L. Meeks, Chief, Pub. Info. Programs Div., CIA, ¶ 4 (Aug. 1, 2012). Mobley concedes that the CIA's first letter was a "mistake." Appellant's Br. 31. Mobley's waiver argument therefore fails on the third prong of the test in *Fitzgibbon*. Although a FOIA response could satisfy that prong, a simple clerical mistake in FOIA processing cannot. A contrary conclusion would be inconsistent with the deference granted to agency determinations in the national security context. *See, e.g.*, *Wolf*, 473 F.3d at 374; *Krikorian v. Dep't of State*, 984 F.2d 461, 464 (D.C. Cir. 1993).

## C.

**Classification of documents.** Mobley also takes issue with the district court's ruling that the FBI properly classified certain responsive records after it received his FOIA request. The problem, as he sees it, is that the official who classified those records acted pursuant to an improper sub-delegation of *post hoc* classification authority. The text of the sub-delegation order indicates that the sub-delegation was permissible.

Executive Order 13,526, 75 Fed. Reg. 707 (Jan. 5, 2010) ("the Order"), sets forth the executive branch's classification system and procedures. Section 1.7(d) of the Order governs the classification or re-classification of previously undisclosed information after it has become the subject of a FOIA request. Classification in those circumstances is permissible "only if" (1) the information meets the Order's substantive requirements and (2) classification "is accomplished on a document-by-document basis with the *personal participation or under the direction of* the agency head, the deputy agency head, or the senior agency official designated under section 5.4 of this order." Exec. Order No. 13,526, § 1.7(d) (emphasis added), 75 Fed. Reg. at 711. At all relevant times, the designated senior agency official within the Justice Department was the Assistant Attorney General for Administration. 28 C.F.R. § 17.11(a).

In 1999, the Assistant Attorney General for Administration delegated his § 1.7(d) authority to the chief of the FBI's Document Classification Unit. Pursuant to that delegation, the document-by-document review mandated by § 1.7(d) was conducted twice in Mobley's case, first by David M. Hardy, the chief of the FBI's Record/Information Dissemination Section — the Document Classification Unit's successor — and later, in Hardy's absence, by Argall, the acting section chief.

Sub-delegation to a subordinate federal official is presumptively permissible, absent affirmative evidence in the original delegation of a contrary intent. *Cf. U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004). Under § 1.7(d) of the Order, *post hoc* classification is permissible so long as a designated official takes part in the decision at one of two levels of involvement: The designated official must personally participate in the classification decision, or the official deciding to classify a document must act under the direction of the designated official. The 1999 sub-delegation order opts for the latter. It requires that the sub-delegee keep the Assistant Attorney General for Administration "apprised in a timely manner of any action taken under this authority." Order, Stephen R. Colgate, Assistant Att'y Gen. for Admin. (Dec. 29, 1999). The ongoing notification requirement qualifies the sub-delegee's classification decisions as made "under the direction" of the Assistant Attorney General for Administration. Mobley points to nothing in the record that suggests a failure to comply with this requirement of the sub-delegation order.

**IV.**

**The Privacy Act.** Mobley also challenges two of the district court's Privacy Act rulings, one pertaining to the FBI and the other to the CIA. Each challenge fails. The FBI's declarations satisfied the requirements of *Doe v. FBI*, 936 F.2d 1346 (D.C. Cir. 1991). The documents withheld by the CIA were not housed in a "system of records" and therefore are beyond the reach of the Privacy Act.

The Privacy Act, 5 U.S.C. § 552a, "safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records . . . by allowing an individual to participate in ensuring

that his records are accurate and properly used, and by imposing responsibilities on federal agencies to maintain their records accurately." *Bartel v. FAA*, 725 F.2d 1403, 1407 (D.C. Cir. 1984). One of the ways the Privacy Act accomplishes this goal is to require any agency that maintains a "system of records" to provide information pertaining to a particular person to that person when he or she asks to access it. 5 U.S.C. § 552a(d)(1). A "system of records" is defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.* § 552a(a)(5). A "record" is "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph." *Id.* § 552a(a)(4).

"The Privacy Act — unlike [FOIA] — does not have disclosure as its primary goal" and instead uses disclosure as a tool to "allow individuals on whom information is being compiled and retrieved the opportunity to review the information and request that the agency correct any inaccuracies." *Henke v. U.S. Dep't of Commerce*, 83 F.3d 1453, 1456–57 (D.C. Cir. 1996). Nevertheless, like FOIA, the Privacy Act provides a cause of action to compel compliance with subsection (d)(1). 5 U.S.C. § 552a(g)(1)(B). Also like FOIA, the Privacy Act carves out exemptions from disclosure when a system of records meets certain criteria. *Id.* §§ 552a(j)–(k).

## A.

Mobley contends that Privacy Act Exemption (j)(2) did not justify the FBI's decision to withhold certain responsive

documents. Exemption (j)(2) permits an agency head to promulgate rules — subject to public notice and comment — to exempt any of the agency's systems of records from several of the Privacy Act's requirements, including disclosure under sub-section (d)(1), so long as the system of records satisfies certain criteria. *Id.* § 552a(j). The agency's principal function must be criminal law enforcement and the system of records must consist of one of three types of information, as relevant here, "information compiled for the purpose of criminal investigation, including reports of informants and investigators, and associated with an identifiable individual." *Id.* § 552a(j)(2).

A Justice Department regulation, promulgated pursuant to §§ 552a(j)–(k), exempts the FBI's CRS from disclosure under sub-section (d) of the Privacy Act. 28 C.F.R. § 16.96(a). A particular record in the CRS is exempt, however, only if the FBI demonstrates that the record is a law enforcement record within the meaning of the Privacy Act. *Doe*, 936 F.2d at 1352–53. According to Argall, the records at issue were "generated as a result of interviews conducted during early 2010 with Sharif Mobley while in Yemeni custody," First Argall Decl. ¶ 31, and "[t]hese records were compiled as a result of the FBI's legitimate law enforcement mission to ascertain the facts and circumstances of the detention of a U.S. Citizen abroad," *id.* ¶ 33; Second Argall Decl. ¶ 11.

Mobley disagrees with the FBI's characterization of those efforts and believes they are better described as consular or diplomatic functions. But even had Mobley offered a basis for the court to accept his characterization, and he does not, Mobley erroneously assumes that a federal agency is capable of acting in pursuit of only a single objective at a time. Agencies may well — and surely often do — seek to advance a variety of objectives through a single act. Here, for example, the FBI may have wanted to "ascertain the facts and circumstances" of

Mobley's detention in order to protect the interests of U.S. citizens abroad and, at the same time, may have wanted to "ascertain the facts and circumstances" of Mobley's detention in order to determine whether Mobley or another person had violated federal criminal laws having extraterritorial effect, *see* Second Argall Decl. ¶ 11. Mobley's view might carry more force if the interview records were compiled by an agency with an express consular mission, but the declarations in the record state that the interview records were compiled "as a result of the FBI's legitimate law enforcement mission," and nothing in the record casts doubt on these being FBI records. The FBI's declarations satisfy the requirements of *Doe*.

## B.

Mobley also challenges the district court's ruling that the DIA's Web Intelligence Search Engine or WISE (hereinafter, "DIA database") falls outside the reach of the Privacy Act because it is not a "system of records." In response to Mobley's FOIA and Privacy Act request, DIA referred to the CIA for processing 41 records that came to the DIA from the Open Source Center, which is managed by the CIA. The CIA withheld six of these records as exempt under FOIA. The government maintains that the 41 open source documents sent to the CIA were not subject to the Privacy Act at all because they were housed in the DIA database.

"A system of records exists only if the information contained within the body of material is both *retrievable* by personal identifier and actually *retrieved* by personal identifier." *Maydak v. United States*, 630 F.3d 166, 178 (D.C. Cir. 2010) (quotation marks omitted) (emphasis in original). In determining whether an agency maintains a system of records, "the court should view the entirety of the situation, including the agency's function, the purpose for which the information was gathered, and the agency's actual retrieval practice and

policies." *Henke*, 83 F.3d at 1461. A court may rely on a non-conclusory agency declaration, absent evidence to the contrary. *McCready v. Nicholson*, 465 F.3d 1, 13 (D.C. Cir. 2006).

The declaration describing the DIA database establishes that it is not a "system of records," 5 U.S.C. § 552a(a)(5). The Chief of the FOIA Services Section of the DIA attests in a sworn statement that the DIA database was "not part of a Privacy Act system of records" because "DIA does not organize records in [the DIA database] by individuals who may be mentioned in those records, nor does DIA retrieve records about individuals from that database by use of an individual's name or personal identifier as a matter of practice." Decl. Alesia Y. Williams, Chief, FOIA Servs. Section, DIA, ¶ 4 (Oct. 12, 2012). The DIA database is "DIA's repository for electronic message traffic" to and from DIA, including open source media articles sent it by other intelligence agencies. *Id.*

Mobley's efforts to call this declaration into question rest on insinuation and supposition. Chiefly, Mobley relies on his attorney's declaration that a DIA representative told him the DIA database is a "search engine [that] returns data from a multitude of sources based on a specific inquiry." Decl. Kelly McClanahan ¶ 6 (June 17, 2013). All databases are searched by some kind of specific inquiry. That says nothing about whether the DIA searches the database by personal identifier. Nor, contrary to Mobley's assertion, do the statements made to his attorney undercut the good faith presumptively accorded Williams' declaration. Williams stated that the DIA database consisted of e-mail traffic to and from other intelligence agencies, which is consistent with what DIA told Mobley's lawyer — that the database is a search engine that draws "data from a multitude of sources." McClanahan Decl. ¶ 6. Accordingly, the district court did not err in its application of the Privacy Act.

**V.**

Finally, Mobley's contention that the district court abused its discretion when it twice declined to review *in camera* an FBI document, which he claims was improperly classified, is unpersuasive.

At its discretion, a district court "may examine the contents of . . . agency records in camera . . . ." 5 U.S.C. § 552(a)(4)(B). "If the agency's affidavits provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents." *Am. Civil Liberties Union v. U.S. Dep't of Defense*, 628 F.3d 612, 626 (D.C. Cir. 2011) (internal quotation marks omitted). When an agency meets its burden through affidavits, "*in camera* review is neither necessary nor appropriate," and "[*i*]*n camera* inspection is particularly a last resort in national security situations like this case." *Larson v. Dep't of State*, 565 F.3d 857, 870 (D.C. Cir. 2009) (internal quotation marks omitted). The court has stated that, in some circumstances, district courts should conduct *in camera* review of allegedly FOIA-exempt documents, as, for example, where the affidavits are too conclusory to permit *de novo* review of the agency exemption decision or where there is tangible evidence of agency bad faith. *Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 392–93 (D.C. Cir. 1987). Another factor that plays into the calculus is the nature of the parties' dispute, because "*in camera* review is of little help when the dispute centers not on the information contained in the documents but on the parties' differing interpretations as to whether the exemption applies to such information." *Id.* at 393.

Here, as our own review confirms, the district court, after reviewing *in camera* the FBI's classified declaration, acted within its sound discretion when it decided that it did not need to review the classified document *in camera* to conclude that the FBI withheld it as properly classified. Mobley points to no record evidence of bad faith. *See id.* at 392–93. Moreover, the document implicates national security, *Larson*, 565 F.3d at 870, and the parties' dispute is over how to interpret the document — whether it was properly classified, *Carter*, 830 F.2d at 393. To the extent Mobley states in his reply brief that *in camera* review would also reveal that the FBI had improperly withheld records on the basis of FOIA Exemption 7(C), the court "need not consider this argument because [Mobley] ha[s] forfeited it on appeal, having raised it for the first time in [his] reply brief," *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008), and shown no extraordinary circumstances to excuse his delay, *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 29 n.4 (D.C. Cir. 2008).

Accordingly, we affirm the orders granting summary judgment in Mobley's two cases and denying reconsideration.